IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARNUM TIMBER CO., a California limited partnership,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>　　　　　Defendants.<br>　　　　　　　　　　　　　　　　　　／ | No. C 08-01988 WHA<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

**INTRODUCTION**

In this action under the Administrative Procedures Act, plaintiff Barnum Timber challenges the EPA's decision to approve California's proposed list of water bodies deemed environmentally impaired under Section 303(d) of the Clean Water Act. Plaintiff claims that the EPA's decision to retain Redwood Creek on the list was arbitrary and capricious. The EPA moved to dismiss on standing grounds. This order finds that plaintiff lacks standing to challenge the EPA's approval of California's Section 303(d) list. Defendant's motion to dismiss is **GRANTED**.

**STATEMENT**

**1. REDWOOD CREEK AND PLAINTIFF BARNUM TIMBER.**

Barnum Timber owns property along Redwood Creek, a creek located near Eureka, California. As explained in greater detail below, the Clean Water Act's Section 303(d) requires each state biennially to develop a list of environmentally impaired water bodies and to submit the list to the EPA for approval or disapproval. In 1992, California recommended, and the EPA approved, the Section 303(d) designation of Redwood Creek as impaired by sediment. In 2002, California and the EPA retained Redwood Creek on the Section 303(d) list as impaired by sediment and also designated the creek as impaired by water temperature. Another Section 303(d) review process in 2006 resulted in Redwood Creek remaining listed as impaired by both sediment and water temperature. These impairment listings, plaintiff alleges, were predicated, at least in part, on the EPA's determination that Redwood Creek was unable to support fish populations at historical levels. In this lawsuit, plaintiff challenges the EPA's retention of Redwood Creek on the 2006 Section 303(d) list.

California's 2002 and 2006 impairment designations followed extensive proceedings in the state's Water Board and the regional North Coast Water Board. The North Coast Water Board initially held hearings and gathered evidence on water bodies in the North Coast region. It then published a Public Review Draft Report detailing the waters in the region that it considered impaired. It allowed public comment on the Draft Report and held further proceedings thereon. It then submitted its recommendations to the State Water Board for review and finalization (Compl. ¶ 20). The State Water Board ultimately accepted the North Coast Board's recommendation that Redwood Creek be designated for impairments and submitted its Section 303(d) list to the EPA for approval (Compl. ¶¶ 27, 31–34). The EPA adopted the State Water Board's findings and recommendations in all respects pertinent to this action, and approved California's Section 303(d) list with Redwood Creek designated as impaired both by sediment and temperature (Compl. ¶¶ 35–36).

Plaintiff alleges that the California Water Board's recommendations were based on faulty assumptions and determinations. Plaintiff participated in the proceedings both in 2002

and 2006, submitting scientific studies of the creek along with raw evidence to support the studies. Plaintiff also claims that an expert examined the river and recommended against impairment by sediment (Compl. ¶¶ 20-26, 32).

Plaintiff contends that, as a result of the EPA's 2006 decision to retain Redwood Creek on the Section 303(d) list of impaired water bodies, plaintiff has suffered extra costs to satisfy land use restrictions and has seen its property values decrease. Plaintiff raises three claims for relief, in turn, challenging the EPA's Section 303(d) determinations pertaining to (1) decreased fish populations, (2) sediment, and (3) temperature. Plaintiff claims that each of these determinations was contrary to the Clean Water Act, 33 U.S.C. 1313(d)(2), and was arbitrary and capricious and not supported by substantial evidence in the record under the Administrative Procedure Act. 5 U.S.C. 706(2)(A), (E). Plaintiff seeks a declaratory judgment that each of these decisions was improper, and injunctive relief preventing defendants from enforcing Redwood Creek's Section 303(d) designation in any respect and vacating the impairment listing.

**2.    CLEAN WATER ACT AND IMPLEMENTING REGULATIONS.**

Resolution of this motion requires an understanding of the structure of the Clean Water Act ("Act") and the interplay between federal and state regulation of water quality. Congress enacted the Act in 1972, amending earlier federal water pollution laws that had proven ineffective. *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002). Those earlier laws included water quality standards but no mechanism to ensure that they were met. *Ibid*. The Act therefore maintained state-set water quality standards but supplemented them with measures to require the use of technological controls to target "the preventable *causes* of pollution." *Ibid*. (emphasis added; citation omitted).

Section 303 is central to the Act's objectives. This section first requires each state to adopt (or maintain) water quality standards, and grants the EPA Administrator the authority to review and, if necessary, amend those standards. Section 303(d) then sets forth mechanisms to control the sources of pollution in order to ensure that the standards are met. 33 U.S.C. 1313(d).

3

The Act adopts different approaches for "point sources," as opposed to "nonpoint sources," of pollution.[1] The Act defines "effluent limitations" as restrictions on pollutants "discharged from point sources." *Id*. at § 1362(11). The Act specifically requires "effluent limitations for point sources . . . which shall require the application of the best practicable control technology currently available." *Id*. at § 1311(b)(1). In contrast, the Act does not directly mandate controls on nonpoint sources of pollution. *Pronsolino*, 291 F.3d at 1128–29.

Effluent limitations and TMDLs are adjusted according to the procedures set forth in Section 303(d). 33 U.S.C. 1313(d). It first provides that "[e]ach State shall identify those waters within its boundaries for which the effluent limitations required by [the Act] . . . are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. 1313(d)(1)(A). The states similarly must identify those waters "for which controls on thermal discharges . . . are not stringent enough to assure protection and propagation of a balanced indigenous population of shellfish, fish, and wildlife." *Id*. at § 1313(d)(1)(B).

For any waters included on a state's Section 303(d) list, the state must propose maximum pollution levels: "[e]ach State shall establish for the waters identified in paragraph (1)(A) of this subsection . . . the *total maximum daily load* ["TMDL"] for those pollutants which the Administrator identifies . . . as suitable for such calculation." *Id*. at § 1313(d)(1)(C) (emphasis added). "A TMDL defines the specified maximum amount of a pollutant which can be discharged or 'loaded' into the waters at issue from all combined sources." *Pronsolino*, 291 F.3d at 1127-28. The term "discharge" refers only to pollution from point sources, while the term "loading" refers to pollution from either point or nonpoint sources." *Id*. at 1128 n.3 (citing 40 C.F.R. 130.2(d)). The Act similarly requires a "total maximum daily thermal load" for waters identified as having insufficient thermal controls. 33 U.S.C. 1313(d)(1)(D).

---

[1] "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. 1362(14). The Act does not defined the term "nonpoint source," although it does utilize the term. The term is understood to refer to diffuse sources of pollution, such as agricultural runoff.

4

1  The Act requires the states to submit Section 303(d) lists with proposed TMDLs to the EPA for review every two years. 33 U.S.C. 1313(d)(2).[2] The Administrator then "shall either approve or disapprove such identification and load not later than thirty days after the date of submission." *Ibid*. If the EPA approves a state's Section 303(d) list and TMDLs, "such State shall incorporate them into its current plan under subsection (e) of this section," but if the EPA disapproves of the list, the EPA "shall . . . identify such waters in such State and establish such loads for such waters as he determines necessary," and the state in turn must incorporate those into its planning process. *Ibid*.

Section 303(e) requires the states to have a "continuing planning process" which includes, *inter alia*, setting effluent limitations and schedules of compliance "at least as stringent as those required by . . . this title," setting TMDLs, and maintaining procedures for revision. 33 U.S.C. 1313(e). The states must submit their plan to the EPA for approval. *Id*. at 1313(e)(2). The Act authorizes permitting programs to meet the objectives set forth in approved plans. *Id*. at 1313(e)(2), 1342(a)–(b).

While the above-described provisions directly regulate point sources of pollution, the Act merely requires states to undertake an assessment process to identify waters for which further controls on nonpoint sources of pollution may be needed, and it provides financial incentives to encourage any such further state regulations that may be necessary. *Id*. at § 1329. The Act makes various federal grants available to the states to aid implementation of the plans and withholds funding for states with inadequate plans. *See id*. at 1255–56, 1287–88, 1381–87. As the Ninth Circuit explained,

> [t]he upshot of this intricate scheme is that the [Act] leaves to the states the responsibility of developing plans to achieve water quality standards if the statutorily-mandated point source controls will not alone suffice, while providing federal funding to aid in the implementation of the state plans.

*Pronsolino*, 291 F.3d at 1128–29. *See also Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1096–97 (9th Cir. 1998).

---

[2] The Act itself specifies only that states shall submit such lists to the Administrator "from time to time," *ibid*., and regulations require the submission of such lists every two years. 40 C.F.R. 130.7(d)(1).

5

## ANALYSIS

EPA moved to dismiss on the grounds that Barnum lacks standing to challenge the EPA's approval of California's Section 303(d) list.[3] The "irreducible constitutional minimum" of standing contains three elements: (1) the plaintiff must have suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

In its complaint, plaintiff offered only conclusory and non-specific claims of injury (Compl. ¶ 39):

> Barnum is presently and continuously injured by the Section 303(d) listing and will be further injured by the development and implementation of TMDLs because it will be forced to alter its land management practices and will be subjected to severe restrictions on the use of its land. Specifically, as a result of these listings, Barnum incurs substantial extra costs in managing its lands, and the listings diminish the available uses of that land. Barnum's property in the Redwood Creek watershed has already lost value because of the inclusion of Redwood Creek on the Section 303(d) list as impaired by sediment and by temperature. The development and implementation of TMDLs will cause additional injury. Barnum is injured by the implementation of the TMDL already established for sediment and by the development and future implementation of a TMDL for temperature; these TMDLs are certain to reduce the value of Barnum's property.

As explained, however, the EPA's challenged Section 303(d) decision, alone, imposes no restrictions or obligations on plaintiff or its land but instead merely feeds into further planning steps under the Clean Water Act which may — or may not — lead to regulation of plaintiff's land. 33 U.S.C. 1313(d)–(e). The complaint does not further explain how the injuries alleged in the above-quoted passage arose or how they are connected to the EPA's Section 303(d)

---

[3] EPA initially moved to dismiss on three grounds: (1) that the complaint's second claim is barred by the applicable statute of limitations, (2) that Barnum lacks standing, and (3) that Barnum's claims are not ripe for adjudication. After Barnum clarified the source of its injuries in its opposition brief, EPA withdrew its statute-of-limitations and ripeness claims, leaving only its contentions regarding standing (Reply at 2 n.1).

6

1  decision. Article III does not permit standing to be predicated on such vague and unsupported
2  claims of injury. *Lujan*, 504 U.S. at 560–61.

3   In its opposition brief, plaintiff clarified for the first time that its injuries arise because,
4  allegedly as a result of Redwood Creek's Section 303(d) listing, a state forestry regulation,
5  CAL. CODE REGS. tit. 14, § 916.9, imposes additional land use restrictions on plaintiff which
6  give rise to land management costs and reduces the value of plaintiff's property (Opp. at 2, 12).
7  Specifically, plaintiff contends that it has been injured because it now must maintain
8  watercourse and lake-protection zones around its property, *id.* at § 916.9(f); it must seek
9  approval of a timber-harvesting plan detailing enforceable environmental precautions, *ibid.*; it is
10 forbidden from harvesting certain profitable trees, *id.* at § 916.9(c), (i); and it has suffered other
11 costs to its operations and limits on the use of its property imposed by Section 916.9 (Opp. at
12 2–4, 12–14). Plaintiff asserts that "[b]ut for EPA's designation of Redwood Creek as an
13 impaired water, Barnum would not be facing burdensome land use restrictions on its property.
14 Due to EPA's designation and retention of Redwood Creek as an impaired water, the California
15 Board of Forestry considers Barnum's property to be threatened and impaired, which triggers
16 the T/I rules" (Opp. at 15).

17   Defendant conceded at the hearing that the application to plaintiff of California's
18 forestry regulations constitutes "injury in fact." Defendant contends, however, that those
19 injures are not traceable to the EPA's Section 303(d) approval in 2006 and would not be
20 redressed by a ruling in plaintiff's favor. This order agrees. Plaintiff fails to establish that the
21 injuries it identifies in its opposition, all of which arise from *California* forestry regulations,
22 were caused by or are in any way connected to the EPA's 2006 approval of California's listing
23 of Redwood Creek. Plaintiff, in fact, fails to identify *any* connection between the California
24 forestry regulation and the Section 303(d) process. Plaintiff offers only the conclusory assertion
25 that its injuries from the state forestry regulation arose as a result of the Section 303(d) listing.
26 Such conclusory statements, without explanation, do not satisfy the constitutional requirements
27 for standing. Moreover, an examination of the California regulation suggests that, in contrast to
28 plaintiff's assertion, Section 916.9 is not in fact triggered by the Section 303(d) process.

7

Section 916.9 was added to California's forestry regulations in 2000, six years prior to the EPA decision plaintiff now challenges, and the *application* of Section 916.9 is triggered *not* by Section 303(d) listing or the Act but rather by actions under state and federal endangered species acts. The regulation states, "[i]n addition to all other district Forest Practice Rules, the following requirements shall apply in any *planning watershed with threatened or impaired values.*" CAL. CODE REGS. tit. 14, § 916.9 (emphasis added). The phrase "watershed with threatened or impaired values" is a defined term: "'Watersheds with threatened or impaired values' means any planning watershed where populations of anadromous salmonids that are listed as threatened, endangered, or candidate under the State or Federal *Endangered Species Acts* with their implementing regulations, are currently present or can be restored." *Id*. at 895.1 (emphasis added).[4] This definition indicates that the regulations allegedly causing plaintiff's injury are not triggered by the Section 303(d) process or the Clean Water Act but rather by actions under federal or state endangered species acts.

Plaintiff offers little else tracing its injuries to EPA's Section 303(d) review. Plaintiff points to the declaration of James Able, a Licensed California Professional Forester, which states that "[d]ue to the [Section 303(d)] listings, the California Department of Forestry has designated Barnum Timber Company's property as Threatened and Impaired. Title 14 CCR 916.9, 936.9, 956.9."[5] As explained, the California regulations that Mr. Able references are not obviously tied to the Section 303(d) process. The Able declaration does not further explain a causal link. Plaintiff also cites a report entitled "Process for Threaten [sic] or Impaired Watershed Regulations Review." In a section titled "Background," the report states (Opp. Exh. 1 at 1):

> In 2000, the California Forest Practice Rules were amended by the State Board of Forestry and Fire Protection (Board) in 11 rule sections for protection of watersheds with anadromous salmonid species. They were termed the 'Threatened or Impaired

---

[4] "Planning watershed" means "the contiguous land base and associated watershed system that forms a fourth order or other watershed typically 10,000 acres or less in size. Planning watersheds are used in planning forest management and assessing impacts." *Ibid*.

[5] Sections 916.9, 936.9 and 956.9 simply apply the same rules to three different forestry districts.

8

Watershed' rules (T/I rules) and included rules for projects in
watersheds listed as impaired under the 303(d) listing process.

The report, which primarily discusses potential amendments to the T/I rules, does not explain how, if at all, the specific forestry regulation at issue is connected to the Act's Section 303(d) process. As explained, any such connection is far from self-evident.[6]

The forestry regulations do contain a *different* provision governing "Section 303(d) Listed Watersheds." CAL. CODE REGS. tit. 14, § 916.12. That regulation states, "[f]or any planning watershed in which timber operations could contribute to the pollutants or stressors which have been identified as limiting water quality in a water body listed pursuant to 303(d) Federal Clean Water Act, [certain rules] shall apply." *Ibid*. Plaintiff does not claim that the land use restrictions causing his injury, all found in Section 916.9, were in any way related to Section 916.12. (In fact, neither party mentioned Section 916.12.) Section 916.12, however, provides additional reason to believe that Redwood Creek's Section 303(d) listing did not automatically trigger more stringent California forestry regulations — under this provision, Section 303(d) listing at most would trigger proceedings to adjust the Act's TMDL or would lead to the development (*with the collaboration of affected landowners*) of watershed-specific regulations. Plaintiff identifies no such proceedings.[7]

---

[6] The report is subtitled "Staff Draft March 24, 2008 For Consideration at the April 2, 2008 Forest Practice Committee Meeting" (Opp. Exh. 1). Each page is marked "Draft 3/24/08." The report is publicly available on the California Department of Forestry and Fire Protection's Website, at http://www.fire.ca.gov/cdfbofdb/pdfs/TI_ReviewProcess_032408.pdf (last visited Sept. 22, 2008).

[7] Specifically, the regulation states:

> For any planning watershed in which timber operations could contribute to the pollutants or stressors which have been identified as limiting water quality in a water body listed pursuant to 303(d) Federal Clean Water Act, the following shall apply:
>
> (a) The Department shall, in collaboration with the appropriate RWQCB and SWRCB, prioritize watersheds in which the following will be done: 1) conduct or participate in any further assessment or analysis of the watershed that may be needed, 2) participate in the development of Total Maximum Daily Load (TMDL) problem assessment, source assessment, or load allocations related to timber operations, and 3) if existing rules are deemed not to be sufficient, develop recommendations for watershed-specific silvicultural implementation, enforcement and monitoring practices to be applied by the Department.

9

1  Federal courts on occasion have found that environmental groups or landowners have
2  standing to challenge the EPA's actions, or the lack thereof, under the Act. For example, in
3  *Alaska Center for the Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994), environmental
4  organizations sued under the Act's citizen-suit provision to compel the EPA to establish
5  TMDLs for Alaskan waters that had been designated as impaired under Section 303(d), as the
6  Act required EPA to do. The Circuit found that plaintiffs had standing because "Congress has
7  determined that the relief plaintiffs seek is the appropriate means of achieving desired water
8  quality." *Id*. at 984. *See also Natural Resources Defense Council v. E.P.A.*,
9  2008 WL 4253944 (9th Cir. 2008) (similar).[8] The failure to regulate pollution certainly causes
10 higher pollution, and a judgment in plaintiffs' favor in such cases would force the EPA to set
11 TMDLs, a step that was specifically designed to lead to tighter regulation of water pollution and
12 improved water quality. Similarly, in *Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002),
13 landowners were permitted to challenge EPA's authority to set TMDLs for certain rivers. The
14 California Department of Forestry and the California Regional Water Quality Control Board
15 had imposed on the plaintiffs certain restrictive permit conditions specifically in order to
16 comply with TMDLs. *Id*. at 1129–30. In those circumstances, the plaintiffs' injuries were
17 directly traceable to the TMDLs. In contrast, here plaintiff identifies no connection between the
18 state regulation causing its injury and the EPA's Section 303(d) action it challenges.
19  Plaintiff also asserts that it has suffered an injury independent of California's
20 Section 916.9 — a decrease in its property value caused by the mere listing of Redwood Creek
21 on the Section 303(d) list. Plaintiff offers nothing to support this claim other than the bare

---

*Ibid*. "Where the Department has recommended that the adoption of watershed specific rules is needed," the regulation prescribes procedures for devising such rules in collaboration with interested entities, including "the landowner(s) or designee with land in the planning watershed." *Id*. at 916.12(c)-(e).

[8] The Supreme Court has ruled that harm caused by pollution to the aesthetic and recreational use of waters is a cognizable injury for standing purposes. *Natural Resources Defense Council v. E.P.A.*, 2008 WL 4253944 at *8 (9th Cir. 2008) (discussing the issue and collecting cases).

10

allegation itself.[9] The injury and causation requirements would be empty if such conclusory and unsupported allegations could alone confer standing. Plaintiff's own authority undercuts its cause. Plaintiff cites *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996). That decision, however, rejected the plaintiff's economic-injury theory of standing because "the [challenged] Act [was] neither the only relevant piece of legislation nor the sole factor affecting the price of grandfathered weaponry . . . . Thus, any finding that the Crime Control Act had a significant impact on the increase in prices of weapons would be tantamount to sheer speculation." *Ibid*.[10] Here, similarly, a broad spectrum of factors, both regulatory and non-regulatory, affect the value of plaintiff's property. Plaintiff has not even attempted, much less succeeded, to isolate Section 303(d) listing from other factors affecting the value of its property. Plaintiff has not even detailed how the value of its property has changed over time.

In sum, plaintiff offers nothing more than conclusory and unsupported allegations that its asserted injuries are in any way related to the Clean Water Act, to Section 303(d) or to California's Section 303(d) planning process. Plaintiff certainly fails to tie his asserted injuries (even assuming they were well-pled) specifically to the EPA's 2006 Section 303(d) approval he seeks to challenge. Plaintiff therefore lacks standing to bring this lawsuit.

---

[9] At the hearing, plaintiff asserted that the declaration of James Able, a licensed professional forester, supports this allegation. The Able declaration focuses predominantly on Section 916.9; it does not clearly identify a diminution in value caused by the mere Section 303(d) listing itself, independent of Section 916.9. In fact, plaintiff, in its opposition, did not interpret the declaration as identifying any such effect — plaintiff cited the Able declaration as identifying a decrease in property value related to California's Section 916.9, but not in support of its claim of a decrease in value arising from the Section 303(d) listing itself (Opp. at 14). In any event, even if read as identifying a decrease in value independently caused by the Section 303(d) listing, the declaration offers nothing more than the bare assertion in support of such an effect.

[10] The decision further explained, quoting an opinion of the D.C. Circuit, that "where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." *Ibid*. (citation omitted).

**CONCLUSION**

For the reasons stated above, defendant's motion to dismiss is **GRANTED**. Plaintiff may move for leave to amend within twenty calendar days of the date of entry of this order. Any such motion should be accompanied by a proposed pleading and the motion should explain why the foregoing problems are overcome by the proposed pleading. Plaintiff must plead its best case. Failing such a motion, all inadequately pled claims will be dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: September 29, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE