1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10

BARNUM TIMBER CO., a California
limited partnership,

11

No. C 08-01988 WHA

Plaintiff,

12
13

v.

**United States District Court**
For the Northern District of California

14

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN
L. JOHNSON, in his official capacity as
Administrator of the United States
Environmental Protection Agency,

**ORDER DENYING
PLAINTIFF'S MOTION
FOR LEAVE TO AMEND**

15
16
17

Defendants.

_____/

18
19

**INTRODUCTION**

20

        In this action under the Administrative Procedures Act, plaintiff Barnum Timber claims

21

that the EPA's retention of Redwood Creek on the list of water bodies deemed environmentally

22

impaired under Section 303(d) of the Clean Water Act was arbitrary and capricious.  A prior

23

motion to dismiss filed by defendant was granted on the grounds that plaintiff lacked standing.

24

Plaintiff now moves for leave to amend the complaint.  This order finds that amendment

25

would be futile because the proposed amendment would not cure the standing problem.

26

Plaintiff's motion for leave to amend, therefore, is **DENIED**.

27
28

**STATEMENT**

The facts of the case and the pertinent regulatory background were set forth in the September 2008, order granting defendant's motion to dismiss (Dkt. No. 27). Barnum Timber owns property along Redwood Creek, a creek located near Eureka, California. The Clean Water Act's Section 303(d) requires each state periodically to develop a list of environmentally impaired water bodies and to submit the list to the EPA for approval or disapproval. In 1992, California recommended and the EPA approved the Section 303(d) designation of Redwood Creek as impaired by sediment. In 2002, California and the EPA retained Redwood Creek on the Section 303(d) list as impaired by sediment and also designated the creek as impaired by water temperature. Another Section 303(d) review process in 2006 resulted in Redwood Creek remaining listed as impaired by both sediment and water temperature. These impairment listings, plaintiff alleges, were predicated at least in part on the EPA's determination that Redwood Creek was unable to support fish populations at historical levels. In this lawsuit, plaintiff challenges the EPA's retention of Redwood Creek on the 2006 Section 303(d) list.

Resolution of this motion requires an understanding of the structure of the Clean Water Act ("Act") and the interplay between federal and state regulation of water quality. The September 2008 order discussed the federal statutory scheme and its interplay with state environmental regulation in detail (Dkt. No. 27 at 3–5). Suffice it to say that, for any waters included on a state's EPA-approved Section 303(d) list, the state and EPA must develop maximum pollution levels for the impaired water body called "total maximum daily loads" ("TMDLs"): "[e]ach State shall establish for the waters identified in paragraph (1)(A) of this subsection . . . the *total maximum daily load* for those pollutants which the Administrator identifies . . . as suitable for such calculation." 33 U.S.C. 1313(d)(1)(C) (emphasis added). "A TMDL defines the specified maximum amount of a pollutant which can be discharged or 'loaded' into the waters at issue from all combined sources." *Pronsolino v. Nastri*, 291 F.3d 1123, 1127–28 (9th Cir. 2002). The state must undertake an environmental planning process to develop appropriate remedial mechanisms to bring the listed water body into compliance. The Act specifically requires controls on "point sources" of pollution, but the Act

United States District Court

For the Northern District of California

1    largely leaves it to the states to control "non-point sources" of pollution to the extent necessary

2    to satisfy the TMDL.  As the Ninth Circuit explained,

3            [t]he upshot of th[e] intricate scheme is that the [Act] leaves to the
             states the responsibility of developing plans to achieve water
4            quality standards if the statutorily-mandated point source controls
             will not alone suffice, while providing federal funding to aid in
5            the implementation of the state plans.

6    *Pronsolino*, 291 F.3d at 1128–29.

7            California's 2002 and 2006 impairment designations followed extensive proceedings in

8    the State Water Board and California's regional North Coast Water Board.  The State Water

9    Board ultimately accepted the North Coast Board's recommendation that Redwood Creek be

10   designated for impairments and submitted its Section 303(d) list to the EPA for approval

11   (Compl. ¶¶ 20, 26–28).  The EPA adopted the State Water Board's findings and

12   recommendations in all respects pertinent to this action, and approved California's

13   Section 303(d) list with Redwood Creek designated as impaired both by sediment and

14   temperature (Compl. ¶¶ 29–35).  Plaintiff alleges that the California State Water Board's

15   recommendations were based on faulty assumptions and determinations.

16           Plaintiff contends that it has suffered various injuries as a result of the EPA's 2006

17   decision to retain Redwood Creek on the Section 303(d) list of impaired water bodies.

18   Plaintiff raises three claims for relief, in turn, challenging the EPA's Section 303(d)

19   determinations pertaining to (1) decreased fish populations, (2) sediment, and (3) temperature.

20   Plaintiff claims that these determinations were contrary to the Clean Water Act and were

21   arbitrary and capricious and not supported by substantial evidence in the record under the

22   Administrative Procedure Act.  Plaintiff seeks a declaratory judgment that each of these

23   decisions was improper and injunctive relief.

24           An order entered on September 29, 2008, granted defendant's motion to dismiss, ruling

25   that plaintiff lacked standing.  Plaintiff had averred that it suffered injuries caused by the

26   application of California forestry regulations.  CAL. CODE REGS. tit. 14, § 916.9.  Those

27   regulations imposed compliance costs and restrictions on the use of plaintiff's land.  Those *state*

28   regulations, however, were not fairly traceable to the challenged *federal* Section 303(d)

1   decision.  The TMDL had yet to be developed for Redwood Creek and the regulations allegedly

2   causing plaintiff's injury bore no discernible relationship to the challenged EPA decision or the

3   Section 303 planning process.  Plaintiff also alleged that the value of its property had decreased

4   from the mere Section 303(d) listing itself, but plaintiff offered only the bare allegation in

5   support of this claim.  Plaintiff now moves for leave to file a proposed first amended complaint.

**ANALYSIS**

7        Under FRCP 15(a), leave to amend a complaint shall be freely given when justice so

8   requires, but "[l]eave to amend need not be granted when an amendment would be futile."

9   *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002).  Plaintiff reiterates its

10  two prior theories of standing, albeit with slightly more careful pleading, and adds a third.

11       Plaintiff first reiterates its claim that the retention of Redwood Creek on the

12  Section 303(d) list directly caused the value of plaintiff's property to fall.  Plaintiff offers the

13  declarations of two California licensed professional foresters, Mr. Herman and Mr. Able.

14  Both opine that although the impact cannot be quantified, in their opinion the Section 303(d)

15  listing of a water body reduces the value of nearby properties because the public perceives that

16  onerous regulations will be forthcoming (Herman Decl. ¶¶ 6–7; Able Decl. ¶¶ 5–6).  The Ninth

17  Circuit, in *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996), rejected

18  a similar economic-injury theory of standing because "the [challenged] Act [was] neither the

19  only relevant piece of legislation nor the sole factor affecting the price of grandfathered

20  weaponry . . . .  Thus, any finding that the Crime Control Act had a significant impact on the

21  increase in prices of weapons would be tantamount to sheer speculation."  *Id*. at 1130 (further

22  explaining that "where injury is alleged to occur within a market context, the concepts of

23  causation and redressability become particularly nebulous and subject to contradictory, and

24  frequently unprovable, analyses") (citation omitted).  This claim was previously dismissed

25  because here, as in *Reno*, "a broad spectrum of factors, both regulatory and non-regulatory,

26  affect the value of plaintiff's property.  Plaintiff [had] not even attempted, much less

27  succeeded, to isolate Section 303(d) listing from other factors affecting the value of its

28  property" (Dkt. No. 27 at 11).  The claim was dismissed even accepting *arguendo* that the

United States District Court

For the Northern District of California

4

declaration Mr. Able then offered expressed substantially the same opinion that he now offers (although his prior declaration was ambiguous in that regard).  Even with that declaration, plaintiff offered nothing but conclusory and unsupported contentions.  The proposed amendment offers nothing new.

Plaintiff next claims once again that standing may be predicated on injuries inflicted by California regulations governing watersheds with threatened or impaired values ("T/I Rules").  CAL. CODE REGS. tit. 14, § 916.9.  Plaintiff now acknowledges (implicitly) that under the plain language of California's forestry regulations, application of the T/I Rules allegedly causing plaintiff's injury are triggered *not* by Section 303(d) listing but rather by impairment listings under federal or state endangered species acts.[1]  Plaintiff now argues, however, that "the T/I Rules are triggered *de facto* by a waterbody's listing under Section 303(d)" and that "[t]he divergence between theory and practice is likely a function of the regulatory terminology" (Br. at 4).  Plaintiff relies on the declaration of Mr. Herman, who explains that "[a]mong California Registered Professional Foresters, the T/I Rules are deemed applicable to a given timber operation based solely upon the existence of a Section 303(d) listed waterbody in or near the place of proposed timber operations" (Herman Decl. ¶ 9).  If it is the common understanding of professional foresters or state regulators — one that is contrary to the plain language of the regulations — that has caused plaintiff's injury, plaintiff may have a grievance with the state.  The EPA cannot be blamed for the understandings of California's foresters or the actions of California's regulators.  Statutory interpretation, however, is a task for courts.  The plain language of Section 916.9 indicates that any injury the regulation has caused is *not* triggered by, and therefore is not fairly traceable to, the EPA's Section 303(d) determination.

---

[1] As explained in the September 2008 order, the regulation states:  "[i]n addition to all other district Forest Practice Rules, the following requirements shall apply in any *planning watershed with threatened or impaired values.*"  CAL. CODE REGS. tit. 14, § 916.9 (emphasis added).  The phrase "watershed with threatened or impaired values" is a defined term:  "'Watersheds with threatened or impaired values' means any planning watershed where populations of anadromous salmonids that are listed as threatened, endangered, or candidate under the State or Federal *Endangered Species Acts* with their implementing regulations, are currently present or can be restored."  *Id.* at 895.1 (emphasis added).

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Finally, plaintiff adds one new theory of standing.  Plaintiff asserts that a different California forestry regulation, CAL. CODE REGS. tit. 14, § 898, has caused plaintiff injury which *is* triggered by the Section 303(d) listing of Redwood Creek.  That regulation states:

> After considering the rules of the Board and any mitigation measures proposed in the plan, the [registered professional forester ("RPF")] shall indicate whether the operation would have any significant adverse impact on the environment.
>
> *          *          *
>
> Cumulative impacts shall be assessed based upon the methodology described in Board Technical Rule Addendum Number 2, Forest Practice Cumulative Impacts Assessment Process and shall be guided by standards of practicality and reasonableness.
>
> *          *          *
>
> When assessing cumulative impacts of a proposed project on any portion of a waterbody that is located within or downstream of the proposed timber operation and that is *listed as water quality limited under Section 303(d) of the Federal Clean Water Act*, the RPF shall assess the degree to which the proposed operations would result in impacts that may combine with existing listed stressors to impair a waterbody's beneficial uses, thereby causing a significant adverse effect on the environment. The plan preparer shall provide feasible mitigation measures to reduce any such impacts from the plan to a level of insignificance, and may provide measures, insofar as feasible, to help attain water quality standards in the listed portion of the waterbody.

*Ibid*. (emphasis added).

Defendant admits that the obligations to "assess the degree to which the proposed operations would result in impacts . . ." and to "provide feasible mitigation measures to reduce any such impacts" constitute injury-in-fact.  Defendant also acknowledges that "the application of Section 898 to a particular water may be triggered by the water's appearance on and EPA-approved Section 303(d) list."  Defendant contends, however, that plaintiff lacks standing because any injury from this provision arises from the independent and intervening actions of a third-party:  the state of California.  Defendant argues that the injury is fairly traceable only to California's adoption of the forestry regulation, not to the EPA's Section 303(d) decision (Opp. at 7–8).

The mere fact that the EPA's Section 303(d) decision contributed in some identifiable way to plaintiff's injury and a court ruling striking the EPA's action would therefore alleviate

6

United States District Court

For the Northern District of California

1    that injury does not mean that the injury necessarily is fairly traceable to defendant's conduct

2    for standing purposes. *Allen v. Wright*, 468 U.S. 737, 753 n.19 ("[e]ven if the relief respondents

3    request might have a substantial effect on the desegregation of public schools, whatever

4    deficiencies exist in the opportunities for desegregated education for respondents' children

5    might not be traceable to IRS violations of law-grants of tax exemptions to racially

6    discriminatory schools in respondents' communities"). *Allen* explained that *even if* the relief

7    sought — forcing the IRS to cease granting tax exemptions to racially discriminatory schools —

8    would have a "substantial effect" on the injury alleged, "[f]rom the perspective of the IRS, the

9    injury to respondents is highly indirect and results from the independent action of some third

10   party not before the court." *Id*. at 757 (internal quotation and citation omitted). *See also*

11   *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 975 (9th Cir. 2003)

12   ("The causation question concerns only whether plaintiffs' injury is dependent upon the

13   agency's policy, or is instead the result of independent incentives governing [a] third part[y's]

14   decisionmaking process") (quoting *Idaho Conservation*, 956 F.2d at 1518).

15         As in *Allen*, from the perspective of the EPA, plaintiff's injury is "highly indirect and

16   results from the independent action of some third party not before the court." California's

17   Forestry Department, not the EPA, promulgated the regulations that caused plaintiff's injury.

18   Its decision to do so was in no way related to the Section 303(d) listing of Redwood Creek.

19   The TMDL for Redwood Creek has not yet been developed; whatever regulatory impacts the

20   Section 303(d) listing may ultimately occasion have yet to occur. California's forestry rules

21   comprehensively regulate plaintiff's conduct irrespective of Redwood Creek's Section 303(d)

22   listing. *See, e.g.*, CAL. PUB. RES. CODE §§ 4581–82 (duty to complete timber harvesting plan

23   and contents thereof); CAL. CODE REGS. tit. 14, § 897 (goals of the forestry implementing

24   regulations); *Id*. at §§ 911–29 (forestry district rules). The fact that California independently

25   chose to condition one of those rules in part on the EPA's otherwise-unrelated Section 303(d)

26   decision does not mean that plaintiff's harm is fairly traceable to the EPA. At root, the injuries

27   plaintiff alleges arise from California forestry regulations, not any action of the EPA.

28   *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987) (plaintiffs

7

1    lacked standing because they "seek 'to change [appellee's] behavior only as a means to alter the

2    conduct of third part[ies], not before the court, who [are] the direct source of [appellant's]

3    injury'") (citation omitted).

4                                            **CONCLUSION**

5           For the reasons stated above, plaintiff's motion for leave to amend is **DENIED**.

6    The accompanying judgment will be entered.

7

8           **IT IS SO ORDERED.**

9

10   Dated:  December 4, 2008.                    _____

11                                                WILLIAM ALSUP
                                                  UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28